In re SOUTHWEST CITIZENS' ORGANIZATION FOR POVERTY ELIMINATION, a/k/a S.C.O.P.E., Debtor.

UNITED STATES of America For and on Behalf of the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff

v.

Joseph D. MARCHAND, Trustee and Southwest Citizens' Organization for Poverty Elimination, Defendants.

Bankruptcy No. 86–07727.
Adv. No. 87–0346.

United States Bankruptcy Court,
D. New Jersey.

Aug. 12, 1988.

Marchand & Marchand by Joseph D. Marchand, Bridgeton, N.J., Trustee, pro se.

United States Atty.'s Office by Paul A. Blaine, Camden, N.J., Asst. U.S. Atty., for U.S.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

This matter is before the court on cross-motions for summary judgment related to a Complaint for Declaratory Relief and Turnover of Property filed by the United States of America for and on behalf of the Department of Health and Human Services ("HHS") against Joseph D. Marchand, trustee of the debtor, Southwest Citizens' Organization for Poverty Elimination, Inc. ("SCOPE"), and the debtor, SCOPE.

On December 12, 1986, SCOPE filed a petition under Chapter 11 of the Bankruptcy Reform Act of 1978 as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Bankruptcy Code). On January 16, 1987, SCOPE's Chapter 11 case was converted to a proceeding under Chapter 7 of the Bankruptcy Code. Joseph D. Marchand, Esquire was subsequently appointed Trustee of SCOPE's bankruptcy proceedings by the United States Trustee for this district.

SCOPE was a community service organization, incorporated under the laws of the State of New Jersey as a non-profit corporation. According to the Affidavit of Gilbert Amgott, Financial Operations Specialist of HHS, SCOPE has been a grantee under the federal Head Start Program, 42 U.S.C. § 9831 *et seq.*, receiving Head Start grant funds on a yearly basis since at least February 1, 1978. SCOPE's last budget year under the Head Start Program was scheduled to expire on January 31, 1987. Under the Head Start Program, SCOPE operated approximately fourteen Head Start centers in Southern New Jersey providing primarily daycare services for the benefit of eligible children, youths and families. Total attendance at these centers averaged approximately 485 children. (*See* Affidavit of Gilbert Amgott filed on June 17, 1987).

Prior to the filing of its bankruptcy petition, SCOPE received grant funds under the Head Start Program from HHS. For each budget year beginning February 1, 1978, SCOPE applied for and received Head Start Program grant funds specifically for the acquisition of equipment which SCOPE later purchased. This equipment is, for the most part, comprised of 20 motor vehicles which SCOPE used for transporting children to and from its Head Start centers. Each yearly award of Head Start Program funds to SCOPE was made subject to the authorizing program legislation, HHS regulations and Office of Human Development Services regulations.

SCOPE's status as a Head Start grantee was terminated by HHS on January 25, 1987 following notification to the HHS in the form of a Resolution of SCOPE's board of directors dated December 9, 1986 which stated:

WHEREAS, SCOPE, Inc. is fully aware of the uncertainty of its future as a viable Community Action Program in the counties of Salem, Gloucester, and Cumberland and

WHEREAS, SCOPE, Inc. recognizes the need to do all that it can to ensure that services to needy families should be maintained in the area, which is among the most deprived in this nation.

BE IT THEREFORE RESOLVED, that SCOPE, Inc. relinquish its responsibility as the grantee for the Head Start Program in the counties of Salem, Gloucester and Cumberland and inform the appropriate funding source of the same.

Since January 26, 1987, Test City Child Care Center, Inc. ("Test City"), as interim grantee, has been operating the Head Start programs previously operated by SCOPE. Pursuant to a consent order entered into by the parties and signed by this court on February 20, 1987, Test City has had the use of the 20 vehicles purchased by SCOPE under a lease which requires that Test City pay $900.00 per month to SCOPE for such use. By this court's February 20, 1987 order the trustee was authorized "effective as of January 28, 1987 to enter into a lease agreement with HHS, pursuant to which HHS may have and provide for the use of its interim Head Start program grantee of the 20 vehicles indentified in the annexed schedule, together with the equipment and supplies identified in the debtor's schedules of inventory filed herein on December 12, 1986 at the monthly rate of $900.00, which monthly rate may be revised downward following the receipt by the trustee of the anticipated appraisal of the foregoing equipment and supplies as the same may indicate is appropriate." According to the Affidavit of Gilbert Amgott, Financial Operations Specialist of HHS, HHS has $122,-902.00 in its possession which had been authorized for use by SCOPE during its last year of operation but have never been released. (*See* Affidavit of Gilbert Amgott at para. 7). Pursuant to 45 C.F.R. § 74.115(c),[1] this amount remains available for payment of any outstanding debts properly incurred by SCOPE for approved Head Start purposes, prior to the termination of its Head Start grant. (*See* Affidavit of Gilbert Amgott at para. 7).

On April 27, 1987, HHS filed a Complaint for Declaratory Relief and Turnover of Property. In the Complaint, HHS contends that SCOPE's legal and equitable title to equipment it acquired with grant funds was at all times expressly subject to HHS' right to require the transfer of the equipment, including title, to another interim grantee pursuant to 45 C.F.R. §§ 74.133 and 74.136(a). Accordingly, HHS requests that this court issue a declaratory judgment stating that the equipment in question, including title, is subject to HHS's right to require its transfer to the interim grantee, Test City, and that SCOPE and the Trustee have no further rights or interest in the equipment. HHS also requests an order directing the Trustee to turnover the equipment to Test City and to return all monies paid by Test City to the Trustee for the use of the equipment.

On May 12, 1987, the Trustee filed an Answer and Counterclaim to HHS's Complaint. The Trustee asserts 11 U.S.C. § 544 as a bar to the relief sought by HHS. In his counterclaim, the Trustee asserts that prior to the filing of its bankruptcy petition, SCOPE obtained funds through the federal Head Start Program to purchase various motor vehicles and that SCOPE also used grant funds to purchase equipment and office supplies presently located at various office sites. The Trustee also asserts that at all times title to the motor vehicles has been in the name of SCOPE and that no written security interest was obtained or filed by the United States of America and/or HHS. Accordingly, the Trustee's interests in the motor vehicles supercedes the United States of America and/or HHS's pursuant to 11 U.S.C. § 544. Thus, the Trustee requests that this court issue a declaratory judgment stating that the interest of the Trustee supercedes any interest of the United States of America and/or HHS in the motor vehicles, equipment and inventory.

On June 15, 1987, the Trustee filed a Motion for Declaratory Judgment seeking the same relief requested in his Counterclaim. This motion, however, has been treated as a Motion for Summary Judgment. On June 17, 1987, HHS filed a Cross–Motion for Summary Judgment and an Answer to the Trustee's Counterclaim. In HHS's Answer to the Trustee's Counterclaim, it raises two separate defenses.

---

1. 45 C.F.R. 74.115(c) provides:
    (c) Termination settlements
    When a grant is terminated, the grantee shall not incur new obligations for the terminated portion after the effective date, and shall cancel as many outstanding obligations as possible. The granting agency shall allow full credit to the grantee for the Federal share of the noncancellable obligations properly incurred by the grantee prior to termination.

First, HHS contends that the Trustee succeeded to the same rights in SCOPE's estate as SCOPE possessed at the time of the filing of its bankruptcy petition. Consequently, the property acquired by SCOPE with grant funds remains subject to HHS's pre-existing right to require its transfer notwithstanding the fact that such property is currently under the legal possession and control of the Trustee. HHS by its motion for summary judgment seeks judgment ordering the turnover of the subject equipment and the return of previous rental payments funded by HHS for the use of that equipment.

■ Section 541(a) of the Bankruptcy Code provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Such a determination as to what constitutes a legal or equitable interest of the debtor is broadly construed. *See e.g. United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). Nevertheless, to the extent that a legal or equitable interest of the debtor in property is limited in the debtor's hands, it is equally limited in the hand of the Trustee. *See e.g. In re Mortgage Funding, Inc.*, 48 B.R. 152, 155 (Bankr.D.Nev.1985); *In re Collins*, 5 B.R. 56 (Bankr.N.D.Fla.1980). In this regard the legislative history of § 541 is instructive to this end:

> [S]ection 541(a) is an all-embracing definition which includes charges on property, such as liens held by the debtor on property of a third party, or beneficial rights and interests that the debtor may have in property of another. However, only the debtor's interest in such property becomes property of the estate.
>
> .     .     .     .     .
>
> [A]s Section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent that such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate, except to the extent that defenses which are personal against the debtor are not effective against the estate.

124 Cong.Rec.H. 11096 (daily ed., Sept. 28, 1978) (remarks of Congressman Edwards). Section 541(d) also provides:

> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

With respect to payment of pre-petition creditors of SCOPE, HHS "intends to pay the legitimate allowable claims of any Head Start creditors up to the amount of Head Start grant funds awarded to SCOPE, but never actually disbursed by plaintiff to the debtor." (*See* Memorandum of Law in Support of Plaintiff's Cross–Motion for Summary Judgment and Turnover of Equipment and Return of Rent Paid, filed June 17, 1987, at p. 14). The Trustee claims that undisbursed federal funds available to pay Head Start creditors is not sufficient to satisfy creditors' claims. (*See* Trustee's Reply Memorandum dated September 2, 1987 at p. 2). Regarding turnover of the equipment purchased by SCOPE, HHS does not disagree that SCOPE's interest in the equipment is property of the estate under 11 U.S.C. § 541. However, HHS argues that "the nature of the debtor's interest in the particular equipment ... was such that it was, at all times, subject to the Agency's right to require the transfer of the equipment to another grantee." (*See* Plaintiff's Memorandum of Law at p. 8).

The enabling legislation for the Head Start program expressly provides that Head Start grants and program agencies shall be subject to HHS's governing regulations. 42 U.S.C. §§ 9835(c) and 9839(c).

Among the pertinent regulations which were expressly included in the terms and conditions of each Head Start grant awarded to SCOPE is 45 C.F.R. 74.133, which provides:

Subject to the obligations and conditions set forth in this subpart, title to real property, equipment, and supplies acquired under a grant or subgrant shall vest, upon acquisition, in the grantee or subgrantee respectively.

45 C.F.R. 74.133.

Also, 45 C.F.R. 74.136 further provides:

(a) HHS right

For items of equipment having a unit acquisition cost of $1,000 or more, the granting agency shall have the right to require transfer of the equipment (including title) to the Federal Government or to an eligible non-Federal party named by the granting agency. This right will normally be exercised by HHS granting agencies only if the project or program for which the equipment was acquired is transferred from one grantee to another. The right shall be subject to the following conditions:

(a)(1) In order for the granting agency to exercise the right, a specific notice that it is exercising the right or considering doing so must be issued no later than the 120th day after the end of HHS grant support for the project or program for which the equipment was acquired. Furthermore:

(a)(1)(i) If the equipment is eligible for the exemption in § 74.135 and ceases to be needed for the project or program for which it was acquired while the project or program is still being performed by the recipient, the notice must have been received by the grantee while the equipment was still needed for that project or program.

(a)(1)(ii) If the equipment is not eligible for those exemptions, the notice must have been received by the grantee before other permissible disposition of the equipment took place in accordance with § 74.139.

(a)(2) If the right is exercised, the grantee shall be entitled to be paid any reasonable, resulting shipping or storage costs incurred, plus an amount computed by multiplying the market value of the equipment by the non-Federal share of the equipment. (See §§ 74.142 and 74.-143.)

(b) Right of parties awarding subgrants

When a grantee awards a subgrant, it may reserve for itself a right similar to that in paragraph (a) of this section for items of equipment having a unit acquisition cost of $1,000 or more which are acquired under that subgrant.

HHS in this case does not claim creditor or lienholder status. HHS has not filed a proof of claim in this proceeding. Instead HHS asserts an equitable ownership interest in the grant property by virtue of the relevant federal regulations which HHS asserts evidences an intent to retain an ownership reversionary interest on the part of the grantor agency in property funded by federal grant monies.

In the case at bar, HHS did not assert its reserved rights to require transfer under 45 C.F.R. 74.136(a) until after December 12, 1986, the date the debtor's original Chapter 11 petition was filed. Counsel for HHS at oral argument stated that the filing of the instant complaint by HHS on April 27, 1987 constituted its assertion of rights under relevant federal regulations. By the terms of that complaint "plaintiff hereby formally requests that title to all equipment subject to the right to require its transfer, be transferred to Test City Child Care Center, interim grantee." The court here notes that on January 23, 1987 HHS filed a motion for turnover of the subject equipment for use by the interim grantee, Test City. At best, its assertion of reserved rights to require transfer can relate back to January 23, 1987. It appears that HHS exercised its reserved rights not later than the 120th day after the end of HHS grant support for the debtor's Head Start program, as required by 45 C.F.R. 74.136(a)(1).

The most recent case paralleling the case at hand is *In re Joliet–Will County Community Action Agency*, 847 F.2d 430 (7th

Cir.1988), *reversing*, 78 B.R. 184 (N.D.Ill. 1987), *affirming*, 58 B.R. 973 (Bankr.N.D. Ill.1986). The debtor, Joliet–Will, was a non-profit community service organization which had been awarded grants by a number of state and federal agencies. Subsequent to the organization filing a Chapter 7 bankruptcy petition, several of the agencies claimed equitable liens in certain unexpended grant funds. One agency also claimed an equitable right to property purchased with grant funds. The grantor agencies filed proofs of claim in the proceeding, the aggregate value of which exceeded the aggregate value of the grant property and grant funds. The grantor agencies in the case before the bankruptcy court conceded that the grant funds and grant property constituted property of the estate but contended that the estate acquired a limited interest, one which was circumscribed by the grant agreements into which the debtor entered into pre-petition. The grantor agencies maintained that the trustee acquired the debtor's mere possessory interest in the grant funds and grant property, subject to the grantor agencies since any application of the funds outside the narrow, specific purposes of the grant would warrant reversion to the grantor agencies. Therefore, the grantor agencies contended that the trustee's intended use of grant funds and grant property exceeded the interest of the debtor's estate and the assets were not available for distribution to creditors. 58 B.R. at 975. The bankruptcy court and district court disagreed, holding that Joliet–Will's assets should be distributed to trade creditors pro rata, minus the usual costs of administration, principally trustee's fees estimated at $4,000.00. The Seventh Circuit reversed.

In *Joliet–Will*, grant documents provided "that upon termination of the grant the grantee shall be allowed full credit for the grantor's share of noncancellable obligations properly incurred pre-termination, and set forth that the grantee shall refund any balance of funds which were unobligated at the end of the grant period." 58 B.R. at 977. The relevant part of the grant agreement provided:

Obligations are the amounts of orders placed, contracts and grants awarded, services received, and similar transactions during a given period that will require payment by the grantee during the same or future period. Project costs are all necessary obligations incurred by a Grantee in accomplishing the objectives of a grant during a project period.

58 B.R. at 977.

The issue as framed by the Seventh Circuit was whether the cash, and personal property purchased with governmental grant money, are assets of Joliet–Will and therefore within the power of the trustee in bankruptcy, or whether they are assets of the federal government and of the state agencies to which the federal government made some of the grants initially, for redistribution to operating organizations such as Joliet–Will. *Joliet–Will, supra,* 847 F.2d at 432. The determination of the issue depended upon the terms under which the grants were made. The Seventh Circuit held that the grants "constituted Joliet–Will a trustee, custodian, or other intermediary who lacks beneficial title and is merely an agent for the disbursal of funds to another." *Joliet–Will, supra,* 847 F.2d at 432. Thus, the funds and personal property bought with them were not assets of the bankruptcy estate. *Id.*

The Seventh Circuit in *Joliet–Will* emphasized the holdings of *Palmiter v. Action, Inc.,* 548 F.Supp. 1166 (N.D.Ind.1982), *aff'd,* 733 F.2d 1244 (7th Cir.1984), and *Buchanan v. Alexander,* 45 U.S. (4 How.) 20, 11 L.Ed. 857 (1846). The district court in *Palmiter* held that the federal government retains an equitable, reversionary interest in federal grant monies given to private, non-profit organizations when such funds can no longer be used for authorized federal grant purposes. The plaintiff was a judgment creditor attempting to garnish grantee funds. The grantee was an Indiana non-profit community service organization substantially funded by direct and indirect federal grants. The case was before the district court for final disposition on a post-judgment garnishment proceeding brought by a judgment creditor of the grantee. The district court dismissed the

post-judgment garnishment proceedings. The court in so ruling stated:

> Were the plaintiff here able to reach those funds which Congress has set aside for specific and laudable goals in order to satisfy a personal, state court judgment, the ability of various local community-service projects to continue operations would not only be impaired, but all such organizations' futures would be threatened by the establishment of such a precedent.

548 F.Supp. at 1172.

The Seventh Circuit Court of Appeals in *Palmiter* affirmed the order of the district court dismissing the judgment creditor's post-judgment garnishment proceedings against the non-profit community service organization, stating:

> [A]ll the monies in the twelve Action accounts which Palmiter seeks to garnish are funds in which the United States has a property interest and which are therefore immune from garnishment. Some of the monies are direct federal grant funds, like the $21,074.04 in the general account, which must be expended for statutorily-authorized purposes or revert to the federal government. Virtually all the remaining funds are indirect federal grant funds administered for the federal government by the state of Indiana. To the extent Action received these funds without having made expenditures for the indirect grant programs, the funds must be expended for those programs. To the extent that Action received the funds in reimbursement for initial indirect grant expenditures, the evidence is clear that Action "borrowed" other federal grant funds to make the expenditures, so that the reimbursement funds must be repaid to those accounts and used for those grant purposes. In either event, funds which can no longer be used for authorized federal grant purposes are subject to an equitable reversionary interest.

733 F.2d at 1249–50.

The *Palmiter* court's rationale for recognizing an equitable, reversionary interest of the United States in those grant funds not paid out "for the narrow purposes specified in the Act and regulations" was based upon a finding of pervasive federal supervision of the expenditures of grant funds. 733 F.2d at 1247. The *Palmiter* court noted the Supreme Court decision in *Buchanan v. Alexander,* stating:

> It is well settled that federal monies are not subject to garnishment proceedings until they have been paid out for the purposes for which they were appropriated. In *Buchanan v. Alexander,* 45 U.S. (4 How.) 20, 11 L.Ed. 857, the Supreme Court explained its rationale and stated the rule:
>
>> The funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by state process or otherwise, the functions of the government may be suspended. So long as money remains in the hands of a disbursing officer, it is as much the money of the United States, as if it had not been drawn from the treasury. Until paid over by the agent of the government to the person entitled to it, the fund cannot in any legal sense, be considered a part of his effects.
>
> 45 U.S. [ (4 How.) ] at 20–21. While it is true that Action is not a federal agency, any contention that this in itself makes the funds in Action's accounts garnishable is meritless.

As the district court noted, Action is "only one link in the bureaucratic chain necessary to move funds from the United States Treasury to local communities" pursuant to the intricate grant system developed by Congress. 548 F.Supp. at 1168. Even though Action is not a federal agency, its management of the federal funds it received nevertheless was governed by pervasive federal legislation and regulations which specified the purposes for which the funds could be used. For instance, its authority to make expenditures under the direct grant program was delineated under Congressional legislation and regulations of the Headstart Program (42 U.S.C. §§ 9831–9852; 45 C.F.R. §§ 1301–1305), the Energy Crisis Intervention Program (42 U.S.

C. § 2809(a)(5), repealed by 95 Stat. 519; 45 C.F.R. Subparts 1061.30, 1061.31, 1061.51 and Parts 1050, 1060, 1067–1069), and the Community Action Program (42 U.S.C. § 2808(a), repealed by 95 Stat. 519; 45 C.F.R. Parts 1050, 1060, 1067–1069). Similarly, Action's authority to make expenditures under its indirect grant programs was spelled out under the federal legislation establishing the Community Services Block Grant program (42 U.S.C. §§ 9901–9912) and the Energy Conservation and Production Act (42 U.S.C. §§ 6851–6892).

733 F.2d at 1247. *Accord In re Penn Central Transportation Co.*, 831 F.2d 1221 (3d Cir.1987).

However, the Seventh Circuit in *Joliet–Will* went one step further than the *Palmiter* and *Buchanan* cases stating:

It might seem that we could rest comfortably on *Buchanan,* a decision whose authority seems not to have been impaired by its great age, and on *Palmiter,* a recent decision of this circuit. However, neither is a bankruptcy case, and *Buchanan* in particular, as our quotation from the opinion indicates, frames the issue as one of federal supremacy. Rights in bankruptcy are largely defined by state law, so the interposition of a bankruptcy proceeding does not necessarily alter the situation. The trustee argues, however, that federal bankruptcy law should enjoy parity with the doctrine forbidding the diversion of federal funds to creditors claiming under state law, and hence that while the federal grants may preempt state garnishment proceedings, they surely cannot be thought to preempt federal bankruptcy law. But the issue is not preemption. A recipient of federal grant money can declare bankruptcy. The issue is who owns the money and the personal property bought with it. (The trustee does not argue that these two classes of Joliet-Will's assets should be treated differently.) We can find no evidence that the authors of the Bankruptcy Code intended to deprive the federal government of property rights that it would enjoy against an unsecured creditor, merely be-cause the creditor is represented by a trustee in bankruptcy.

*Joliet–Will, supra,* 874 F.2d at 433.

As noted by the Seventh Circuit in *Joliet–Will,* some cases describe the government's property interest as an "equitable lien." 847 F.2d at 433, *citing Henry et al. v. First National Bank of Clarksdale,* 424 F.Supp. 633 (N.D.Miss.1976), *aff'd,* 595 F.2d 291 (5th Cir.1979) *reh. den.,* 601 F.2d 586, *cert. den. sub nom Claiborne Hardware Co. v. Henry,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *In re Madison County Economic Opportunity Commission,* 53 B.R. 541 (Bankr.S.D.Ill.1985).

In the *Henry* case, the United States sought in federal court to enjoin a state court's attachment of federal grant monies received by a local non-profit community service organization. The district court preliminarily enjoined the garnishment of funds in the grantee bank accounts holding:

The Head Start Act and regulations promulgated pursuant thereto, provide that title to all property purchased with grant funds is vested in the grantee solely for the purpose of enabling the grantee to carry out the objective of the grant, i.e., operate a Head Start Program as authorized by the Head Start Act, 42 U.S.C. § 2921, et seq. The United States has a full and complete lien interest in all funds and property purchased by MAP with funds advanced by HEW. In order to protect the interest of the United States in these funds and property, it is necessary to enjoin defendants from subjecting, in any way, such funds and property to the satisfaction of the state court's monetary awards. The objective of the Head Start Program would be curtailed, if not eliminated, if such injunctive relief is not granted.

The courts have long recognized and enforced the rule that no property interest of the United States can be subjected to judicial process without the consent of the sovereign. *United States v. Alabama,* 313 U.S. 274, 281 [1013–14], 61 S.Ct. 1011, 85 L.Ed. 1427 (1941), *Maricopa County v. Valley National Bank,*

318 U.S. 357, 362, 63 S.Ct. 587 [589], 87 L.Ed. 834 (1943).

424 F.2d at 637. The Fifth Circuit Court of Appeals in affirming the decision of the district court addressed the issue of whether the United States had a property interest in the grant funds and property of the non-profit agency, stating:

It is undisputed that virtually all of MAP's assets derive from grants made through the Department of Health, Education and Welfare under the Headstart–Follow Through Act 42 U.S.C. § 2928, *et seq.* (1976), and predecessor statutes authorizing funding for qualified Headstart Programs. The Act carefully delineates the purposes for which grant funds may be expended. Although MAP is a private, nonprofit corporation and not a federal agency, extensive and detailed regulations govern its expenditure of federal funds in order to ensure the use of grant funds for approved purposes. *See* 45 C.F.R. Part 74 (1977). The United States retains a reversionary interest in all grant funds and in all property purchased with such funds that can no longer be used for the narrow purposes specified in the Act and regulations ... the United States' continuing interest in the grant funds met the criteria for creation of an equitable lien.

*Henry et al. v. First National Bank of Clarksdale et al., supra,* 595 F.2d at 308–09.

The bankruptcy court in *In re Madison County Economic Opportunity Commission,* 53 B.R. 541, 544–45 (Bkrtcy.S.D.Ill. 1985) relying on *Henry* held that "the continuing interest and tight control that the plaintiff [Illinois Department of Transportation] retained in [certain federal] grant funds meets the criteria for creation of an equitable lien." However, the equitable lien was in the vehicles purchased by the grantee, to the extent the agency could "prove the amount of funds used in purchasing said vans." *Id.* The court found that the funds given to the debtor by the plaintiff were to be used for specific purposes as noted in the grant agreement, relying upon the following portion of the agreement:

"If during such period Project facilities are not used in accordance with the application or service plan, as the case may be, the Grantee shall immediately so notify the Department. Upon learning of the misuse of Project facilities from the Grantee or in any other manner, the Department, subject to approval of UMTA, may require the Grantee to ..."

*Id.* at 544.

The Seventh Circuit in *Joliet–Will* describes the usage of the "equitable lien" theory in *Henry* and *Madison County* as unfortunate, since as normally understood an equitable lien is an unperfected security interest, which the trustee in bankruptcy can set aside. *Joliet–Will, supra,* 847 F.2d at 433. *See e.g., In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104, 120 (Bankr.S.D. N.Y.1982). Thus, The Seventh Circuit in *Joliet–Will* concluded that cases like *Henry* use equitable lien in a special sense, equivalent to beneficial ownership. 847 F.2d at 433.

The grant agreements in the *Joliet–Will* case were similar to that in the case at hand, in that, the grant agreements provided that the grantee would retain title to property purchased with grant funds subject to the grantor agency's discretionary right to transfer title to property worth $1,000.00 or more back to the grantor or to a third party. *Joliet–Will, supra,* 847 F.2d at 432.

HHS' argument rests upon the assertion of its rights under 45 C.F.R. 74.136(a), which provides HHS with the right to require transfer of equipment, including title, to another grantee. HHS argues that § 541(a)(1) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). To the extent a legal or equitable interest of the debtor in property is limited in the debtor's hands, it is equally limited in the hands of the trustee. *In re Mortgage Funding, Inc., supra,* 48 B.R. at 154–55. The trustee, therefore, acquires only the rights that the debtor had pre-petition and nothing more. *Id.* HHS does not

contest the fact that the equipment obtained by SCOPE with the grant funds constitutes property of the estate. However, HHS does assert that the rights in the equipment taken by the Trustee pursuant to § 541(a) are subject to HHS' rights under 45 C.F.R. 74.136(a), just as SCOPE's rights were so limited pre-petition.

Prior to this court's analysis of the respective property interests at issue, it must note that the issues are before the court on cross-motions for summary judgment. The purpose of summary judgment is to avoid a trial which is unnecessary and results in delay and expense, by promptly disposing of any actions in which there is no genuine issue of material fact. *Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir.1974). Summary judgment is a "drastic remedy" which is not to be granted liberally. *Id. cited with approval in, Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981). A trial court may enter summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Bankr.R. 7056; *See generally, Hollinger v. Wagner Mining Equipment Company*, 667 F.2d 402, 405 (3d Cir.1981).

The court must resolve all factual disputes, all doubts as to the existence of genuine issues of material fact, and any inferences that may be drawn from underlying facts against the moving party. *See Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980); *In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1010 (E.D.Pa.1986).

The party moving for summary judgment has the burden of demonstrating that there exists no genuine issue of material fact. *Fairbanks Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817, 824 (3d Cir.1951). Some courts have held that whenever there is even the "slightest doubt" regarding the facts of a case, summary judgment may not be granted. *To-*

*malewski v. State Farm Life Insurance Company, supra*, 494 F.2d at 884.

This court determines that there are no issues of material fact to be resolved herein. There exists solely issues of law which have been fully briefed and argued by the parties, and are therefore ripe for determination.

■ This court holds that the Trustee acquired rights in the subject property which were held by the debtor pre-petition. These rights are subject to the federal government's rights under the Head Start legislation—which amount to a "reversionary interest." *Accord, Joliet–Will, supra*, 847 F.2d at 430. Therefore, the Trustee's position as a hypothetical lien creditor under § 544 is superceded by the federal government's rights under the Head Start program 45 C.F.R. 74.136.

Based upon the foregoing, this court shall deny the Trustee's motion for summary judgment finding that he is not entitled to the judgment it seeks as a matter of law. Regarding HHS' cross-motion for summary judgment, this court shall grant said motion in light of its finding that HHS' rights in the motor vehicles and equipment purchased with grant funds and within the purview of 25 C.F.R. 74.136(a) are paramount to those of the Trustee. The court shall direct that the Trustee turnover to HHS the subject equipment and return to HHS all previous rental payments funded by HHS for use of the equipment by the interim grantee. The court here does not rule on what rights the Trustee may assert under 45 C.F.R. 74.136, including reasonable shipping or storage costs incurred.

An appropriate order in conformance with this opinion shall be submitted.